IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **OREGON MOMS UNION,** an Oregon political action committee; **MELISSA ADAMS,** an individual; **SPUD MONKEY'S INC.,** an assumed business name of **WATER HOLE NO. 2 SALOON, INC.**, an Oregon corporation; and **HEART OF MAIN STREET**, an Oregon political action committee,<br><br>        Plaintiffs,<br><br>   v.<br><br>**KATHERINE "KATE" BROWN**, in her official capacity as Governor of the State of Oregon,<br><br>        Defendant. | Case No. 3:21-cv-00678-IM<br><br>**OPINION AND ORDER** |

Edward H. Trompke & Christopher K. Dolan, Jordan Ramis PC, Two Centerpointe Dr., Suite 600, Lake Oswego, OR 97035. Attorneys for Plaintiffs.

Marc Abrams, Brian Simmonds Marshall & Christina L. Beatty-Walters, Oregon Department of Justice, 100 SW Market Street, Portland, OR 97201. Attorneys for Defendant.

**IMMERGUT, District Judge.**

Before this Court is Plaintiffs' Motion for a Temporary Restraining ("TRO"), ECF 7, pursuant to Rule 65 of the Federal Rules of Civil Procedure. Plaintiffs seek an injunction blocking the enforcement of (1) Governor Brown's March 12, 2021 Executive Order 21-06 ("EO 21-06"), which requires all Oregon public schools to offer some in person instruction, either full or part time, for elementary, middle and high school students, and (2) the April 29, 2021 Executive Order 21-10 ("EO 21-10") which extends the state of emergency in response to the COVID-19 outbreak in Oregon and permits the continued implementation of county-by-county risk level public health safety restrictions.

Plaintiff Oregon Moms Union ("OMU") is an Oregon political action committee representing the interests of parents of kindergarten through twelfth-grade public school children in Oregon. ECF 10 at ¶ 2. OMU seeks the reopening of Oregon public schools for full-time, in-person instruction for the remaining weeks of the school year. *Id.* at ¶ 5. Plaintiff Melissa Adams is the owner and operator of Plaintiff Spud Monkey's Inc., an eating and drinking establishment in Gresham, Oregon. ECF 9 at ¶ 2. Plaintiff Heart of Main Street is an Oregon political action committee representing the interests of business owners, including eating and drinking establishments. ECF 11 at ¶ 2. Together, Plaintiffs contend the challenged executive orders violate the equal protection and due process clauses of the United States Constitution.[1] ECF 1 at ¶¶ 33–45.

---

[1] Plaintiffs also asserted an improper delegation claim under the Oregon Constitution in their Complaint and TRO, ECF 1 at ¶¶ 46–49, ECF 7 at 12–14, but subsequently withdrew this claim at oral argument, conceding this Court has no jurisdiction to hear state law claims barred by the Eleventh Amendment. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984).

PAGE 2 – OPINION AND ORDER

On May 19, 2021, this Court held oral argument. After considering the pleadings, declarations, exhibits, and arguments of counsel, this Court finds Plaintiffs have failed to show sufficient facts and adequate legal support to warrant an order enjoining the enforcement of EO 21-06 and EO 21-10. For the reasons that follow, Plaintiffs' Motion for Temporary Restraining Order, ECF 7, is DENIED.

## BACKGROUND

Since March 2020, the COVID-19 pandemic has caused death and major disruptions to daily life for people around the world, including in Oregon. On March 8, 2020, Oregon Governor Kate Brown issued Executive Order 20-03 ("EO 20-03"), declaring a statewide state of emergency in response to the COVID-19 outbreak in Oregon. ECF 1 at ¶ 17. Defendant subsequently extended EO 20-03 six times. *Id*. at ¶ 19.

In December 2020, the Governor issued EO 20-66, which created a framework for county-by-county metrics for controlling COVID-19 transmission.[2] Under that executive order, the Oregon Health Authority ("OHA"), developed risk level metrics that set "safety measures, operational limits, and capacity limits for different sectors of the economy" based on county transmission.[3] Since the Governor issued EO 20-66, counties around the state have been governed by the metrics that apply depending on the county's current risk level. Under that

---

[2] ECF 21 at 9 & n.14 (citing *Executive Order 20-66: Risk and Safety Framework: County-By-County Metrics-Based Approach to Controlling COVID-19 Transmission to Conserve Hospital Capacity and Protect Human Health and Human Lives*, coronavirus.oregon.gov (Dec. 3, 2020), available at https://www.oregon.gov/gov/Documents/executive_orders/eo_20-66.pdf).

[3] *Executive Order 20-66: Risk and Safety Framework: County-By-County Metrics-Based Approach to Controlling COVID-19 Transmission to Conserve Hospital Capacity and Protect Human Health and Human Lives*, coronavirus.oregon.gov (Dec. 3, 2020), available at https://www.oregon.gov/gov/Documents/executive_orders/eo_20-66.pdf).

framework, limitations on operating certain sectors of the economy have tightened or loosened depending on criteria such as case rates and percent positivity.

On March 12, 2021, Governor Brown issued EO 21-06, requiring all Oregon public schools to offer some in person instruction, either full or part time, for elementary, middle, and high school students. ECF 1-1 at 1.

On April 19, 2021, COVID-19 vaccines were made available to all Oregonians age 16 and over, after being made available to educators and older residents earlier. ECF 1 at ¶ 25. On April 27, 2021, Governor Brown updated Oregon county COVID-19 risk levels under the state's public health framework. *Id.* at ¶ 21. In this update, Governor Brown placed fifteen Oregon counties in the "Extreme Risk" category, including Multnomah County. *Id*. On April 29, 2021, Governor Brown issued EO 21-10, in which she extended EO 20-03, the emergency declaration, for an additional 60 days. ECF 1-2. On May 7, 2021, Governor Brown lifted the "Extreme Risk" restrictions imposed on April 19 that prevented indoor dining. She indicated that she does not expect to restore those restrictions in the future. Accordingly, Plaintiffs currently must adhere to the "High Risk" restrictions, which impose a 25% capacity cap on indoor dining. ECF 1-3 at 1.

On May 4, 2021, Plaintiffs filed this action, ECF 1, and the next day, they filed the present motion for a temporary restraining order, ECF 7.

## DISCUSSION

**A. Schools**

Defendant contests OMU's standing to challenge EO 21-06. To sue in federal court, a "constitutional minimum" of standing must be met. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). That minimum requires three elements to be satisfied: (1) the plaintiff must have suffered an "injury in fact"—i.e. an invasion of a legally protected interest that is concrete and particularized, as well as actual or imminent (as opposed to conjectural or hypothetical); (2) there

must be a causal connection between the injury and the offending conduct; and (3) it must be "likely," as opposed to "merely speculative," that the injury will be redressed by a favorable decision from the court. *Id.* at 560–61 (internal quotations and citations omitted); *see also Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). The plaintiff bears the burden of proving all three elements. *Lujan*, 504 U.S. at 561.

Organizations can assert standing on behalf of their members ("associational standing"), or in their own right. *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 662 (9th Cir. 2021). OMU asserts standing on behalf of its "members." ECF 18 at 9. An organization establishes associational standing if: (1) "its members would otherwise have standing to sue in their own right"; (2) "the interests at stake are germane to the organization's purpose" and; (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000); *see also Assoc. Gen. Contractors v. Cal. Dep't of Transp.*, 713 F.3d 1187, 1194 (9th Cir. 2013).

Implicit in the first prong of this test is the requirement that an organization must generally have "members" to bring suit on their behalf. Although formal membership is not required, the organization must be "sufficiently identified with and subject to the influence of those it seeks to represent as to have a 'personal stake in the outcome of the controversy.'" *Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1098 (9th Cir. 2021) (quoting *Or. Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1111 (9th Cir. 2003)). Courts look at whether the individuals the organization purports to represent possess "the indicia of membership" to satisfy the purposes undergirding the concept of associational standing. *Or. Advoc. Ctr.*, 322 F.3d at 1111.

On the record before this Court, OMU has not shown it is "sufficiently identified with and subject to the influence" of the individuals it seeks to represent in this lawsuit. OMU submits declarations from five women who all contend they have children in Oregon public schools. ECF 10; ECF 29; ECF 30; ECF 31; ECF 32; ECF 33. The declarants summarily assert that OMU "represents [their] interests" in this matter. None of the declarants allege that OMU is a membership organization or that any one of them are "members." Nor do the declarants indicate the extent of their involvement with OMU, or provide any details regarding OMU's organizational structure or funding. By contrast, Defendant submitted evidence to this Court indicating OMU is a political action committee, formed on March 30, 2021 with a reported $205 in contributions and loans as of May 13, 2021. ECF 26 at 3–4. The organization has spent less than $600 as of May 13, 2021 as well. This Court cannot conclude on the record before it that the declarants OMU seeks to represent possess sufficient "indicia of membership" to justify OMU's Article III standing to bring suit on their behalf.

Even if this Court were to assume OMU could assert claims on behalf of these declarants, OMU must still "show that a member suffers an injury-in-fact that is traceable to the defendant and likely to be redressed by a favorable decision." *Assoc. Gen. Contractors*, 713 F.3d at 1194.

OMU claims its "members" suffered injury from the issuance of EO 21-06, which requires all Oregon public schools, kindergarten through twelfth grade, to offer some in person instruction, either full or part-time, for all students. Specifically, EO 21-06 provides:

> Not later than the week of March 29, 2021 for grades K-5, and the week of April 19, 2021 for grades 6-12, all public schools in Oregon shall be in operation to deliver educational services through either a hybrid instructional model or an on-site instructional model. After those dates, it will no longer be an

option for public schools to exclusively offer a comprehensive
distance learning instructional model.[4]

ECF 1-1 at 5. An "on-site instructional model" is defined in the EO as full-time, in-person schooling. *Id*. In essence, the EO removed the authority for public schools to offer only online learning. ECF 23 at ¶ 13.

The degree to which individual schools have reopened for in-person learning since the issuance of EO 21-06 has been decided by local school boards, public charter schools, and private schools in compliance with Oregon Department of Education ("ODE") and OHA health and safety-based protocols. *Id.* at ¶ 15–16. As of May 14, 2021, more than 500 schools in Oregon were reporting full-time on-site operations.[5]

OMU has not sufficiently demonstrated that any of its "members" suffers an injury-in-fact from EO 21-06. *See Assoc. Gen. Contractors*, 713 F.3d at 1194 ("[P]rov[ing] the requisite injury to a member requires, first 'specific allegations establishing that at least one *identified member* had suffered or would suffer harm.'") (quoting *Summers v. Earth Island Institute*, 555 U.S. 488, 498 (2009)). None of the declarations submitted by OMU "members" indicate explicitly that the declarants' children are currently attending hybrid school, as opposed to full-time, in-person instruction. ECF 10; ECF 29; ECF 30; ECF 31; ECF 32; ECF 33. Rather, each

---

[4] A "comprehensive distance learning instruction model" is defined in EO 21-06 as "an instructional model in which all students are engaged in learning via remote means, with limited in-person supports for students in some circumstances, in accordance with the requirements in guidance issued by the Oregon Department of Education and the Oregon Health Authority." ECF 1-1 at 5.

[5] ECF 21 at 13 & n.35 (citing *2020-21 School Status*, Oregon.gov, available at https://www.oregon.gov/ode/students-and-family/healthsafety/Pages/2020-21-School-Status.aspx, last accessed May 20, 2021).

declare they have a child in the public school system in Oregon and "want [their] children in full time, in-person school." *See, e.g.*, ECF 29 at ¶¶ 1–3.

The declarants also do not provide any information from which this Court could infer that their children attend hybrid school, such as the school district where they reside. At oral argument, Plaintiffs' counsel contended that all of the declarants had at least one child in hybrid school, but the arguments of attorneys are not evidence properly considered by the Court, nor can they support the basis for the extraordinary remedy of a TRO. Absent any concrete indication that the declarants have been harmed by EO 21-06, OMU has failed to show that any of its alleged members has sustained any "injury in fact" from the Governor's policy. *See Assoc. Gen. Contractors*, 713 F.3d at 1195–95 (finding an organization had failed to demonstrate associational standing because it failed to submit declarations by any of its members attesting to the harm they suffered under the defendant's challenged program).

Further, even if the declarants could demonstrate "injury-in-fact," none have shown that their injury will be redressed by a favorable decision from the Court. *See Lujan*, 504 U.S. at 561. To establish standing, "it must be it must be 'likely,' as opposed to merely 'speculative,' that the [plaintiff's] injury will be 'redressed by a favorable decision.'" *Id.* (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 43 (1976)). Here, OMU only asks this court to enjoin the enforcement of EO 21-06. ECF 27 at 6. OMU takes issue with the EO because it "delegates discretion to local school leaders about in-school or 'hybrid' education, without guidance or limitation" and "simply allows any school board or management" to make the decision "in their discretion." ECF 18 at 8; *see also* ECF 27 at 6 (asserting EO 21-06 creates "classes of persons

that do not receive equal public education, not based on any finding . . . but merely at the discretion of a local school board whose decision may be based on limitless factors."). [6]

As revealed by OMU's own arguments, EO 21-06 does not prevent schools from returning to full-time, in person education. EO 21-06 *encourages* all schools to return kids to classrooms for in-person instruction by requiring them to offer at least some in-person instruction for every student through a hybrid instructional model. ECF 23 at ¶13. Thus, enjoining EO 21-06 would only remove the Governor's mandate to end comprehensive distance learning. The decision to keep public schools in a hybrid learning model are made at the local level, not by the Governor. *Id.* at ¶ 15.

Striking down EO 21-06 would not force all Oregon public schools to return to full-time, in-person learning for the remaining four weeks of the school year. OMU contends that in the absence of EO 21-06, Oregon law (O.R.S. 339.010 and O.R.S. 339.020) requires public schools to offer full-time, in-person instruction. This conclusion is not clearly supported by the text of the statutory provisions OMU cites, nor can OMU point to any authority supporting such an interpretation. Moreover, Plaintiffs concede that striking down the EO would not actually excuse Oregon public schools from continuing to abide by ODE and OHA health and safety protocols, such as physical distancing requirements. *See* ECF 24 at ¶ 27. Outside the EO, the State Board of Education has separately mandated all Oregon public school districts and charter schools to comply with those protocols for the entire 2020–21 school year. *See* OAR 581-022-0104(5).

---

[6] In other parts of their briefing, Plaintiffs suggest EO 21-06 is an improper abuse of Defendant's emergency powers pursuant to O.R.S. chapter 401 because it violates Oregon law's "requirement for in-person instruction" under O.R.S. 339.010 and O.R.S. 339.020. *See* ECF 7 at 4–5; ECF 27 at 4–5. To the extent Plaintiffs seek to challenge the Governor's use of emergency powers under state law, such claims are barred from being heard in this Court by the Eleventh Amendment. *See Pennhurst*, 465 U.S. at 100.

PAGE 9 – OPINION AND ORDER

Both parties agree this guidance may effectively preclude some public schools from reopening for full-time, in-person instruction because of mandatory physical distancing requirements. *See* ECF 23 at ¶ 16. At oral argument, OMU conceded that these safety protocols, which would remain in effect even without EO 21-06, would render full-time, in-person instruction for some schools "impossible."

Given these circumstances, OMU has not demonstrated how enjoining EO 21-06, which mandates the return to at least hybrid-learning, would force any Oregon public school to re-open for full-time, in-person instruction. Indeed, the record before this Court suggests that the fate of school reopenings rests with other third-party entities not before this Court. Because OMU cannot show that its members' harms might "be redressed by a favorable decision" from this Court, *Lujan*, 504 U.S. at 561, none of its members have standing to sue in their own right.

In sum, OMU has failed to establish associational standing to challenge EO 21-06. Therefore, this Court lacks jurisdiction to consider the merits of its claims. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93–94 (1998). The TRO against EO 21-06 must be denied on that basis alone.

**B. Restaurants**

The Court proceeds to analyze the TRO as it relates to Plaintiffs Spud Monkey's, Inc. and Melissa Adams's challenges to EO 21-10.[7] In deciding whether to grant a motion for a temporary restraining order ("TRO"), courts look to substantially the same factors that apply to a

---

[7] The Court doubts that Plaintiff Heart of Main Street has established associational standing sufficient to challenge EO 21-10 based on Dean Hurford's declaration alone. *See* ECF 11. Nevertheless, because Spud Monkey's, Inc. and Melissa Adams have standing to challenge EO 21-10, the Court need not squarely address the question. *See Melendres v. Arpaio,* 695 F.3d 990, 999 (9th Cir. 2012) ("[O]nce the court determines that one of the plaintiffs has standing, it need not decide the standing of the others.") (internal quotation marks and citation omitted).

court's decision on whether to issue a preliminary injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). A plaintiff seeking a preliminary injunction generally must show that: (1) he or she is likely to succeed on the merits; (2) he or she is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his or her favor; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Plaintiffs bear the burden of demonstrating that they meet all four of the *Winter* factors necessary to obtain a TRO. *DISH Network Corp. v. F.C.C.*, 653 F.3d 771, 776 (9th Cir. 2011).

### 1. Likelihood of Success on the Merits

#### a. Equal Protection

Both parties agree that rational basis review is the governing standard here for restaurant plaintiffs. ECF 7 at 10–12; ECF 21 at 15. Under that standard, equal protection generally requires that a classification drawn by the government be "'rationally related to a legitimate government interest.'" *United States v. Navarro*, 800 F.3d 1104, 1113 (9th Cir. 2015) (quoting *United States v. Ruiz–Chairez*, 493 F.3d 1089, 1091 (9th Cir. 2007)). There are two analytical steps. "First, we must determine whether the challenged legislation has a legitimate purpose. Second, assuming a legitimate purpose, we must decide whether the challenged classification promotes that purpose." *Jackson Water Works, Inc. v. Pub. Utils. Comm'n of State of Cal.*, 793 F.2d 1090, 1094 (9th Cir. 1986) (internal citations omitted). "There need not be a 'tight fitting relationship' between the legislative goal and the result. All that is needed to uphold the state's classification scheme is to find that there are 'plausible,' 'arguable,' or 'conceivable' reasons which may have been the basis for the distinction." *Id.* (internal citations omitted). Still, "the justification for the law may not rely on factual assumptions that exceed the bounds of rational speculation." *Golinski v. U.S. Office of Pers. Mgmt.*, 824 F. Supp. 2d 968, 996 (N.D. Cal. 2012)

(citing *Lewis v. Thompson*, 252 F.3d 567, 590 (2d Cir. 2001)). Here, Plaintiffs must "demonstrat[e] a 'likelihood' or 'serious question' that they would be able to refute all rationales for this distinction and its relationship to the goal." *Angelotti Chiropractic, Inc. v. Baker*, 791 F.3d 1075, 1086 (9th Cir. 2015).

This Court finds at the first analytical step that the challenged EO has a legitimate purpose: protecting the health and safety of Oregonians from COVID-19.

At the second step, Plaintiffs clarified at the hearing that the relevant classifications are (1) Oregon's restaurants and taverns, and (2) other retail and grocery stores that are permitted to operate at higher capacity levels.[8]

This Court finds Defendant's distinctions between restaurants/taverns and retail and grocery stores to be rationally related or drawn to achieve the legitimate interest. Restaurants and bars pose a heightened risk of COVID-19 spread because patrons sit at tables together, whether inside or outside, for extended lengths of time, without face coverings while they eat and drink. ECF 24 at ¶¶ 16–18; *see also Village of Orland Park v. Pritzker*, 475 F.Supp.3d 866, 886–87

---

[8] Plaintiff focuses on the differential treatment with respect to capacity limitations between restaurants and other retail and grocery stores. For counties at "Extreme Risk" as designated by the framework, indoor dining is prohibited, outdoor dining is allowed, and takeout is "highly recommended." ECF 1-3 at 1. Also at this risk level, retail stores and indoor and outdoor shopping centers or malls may operate at a maximum of 50% capacity. *Id*. At the "High Risk" level, indoor dining is allowed up to 25% capacity or 50 people, whichever is smaller. *Id*. Also at the "High Risk" level, retail stores and indoor and outdoor shopping centers or malls may operate at 50% maximum capacity. *Id*. The "Moderate Risk" level limits indoor dining to 50% capacity or 100 people, whichever is smaller; and limits retail stores and indoor and outdoor shopping centers to 75% capacity. Lastly, the "Lower Risk" level limits indoor dining to 50% capacity (with no limitation to a certain number of people, "whichever is smaller") and limits other stores to 75%. *Id*. No EO, nor the tiered risk framework, has differentiated between vaccinated and unvaccinated persons. The Court notes that "indoor recreation and fitness establishments" and "indoor entertainment establishments" have the same indoor capacity restrictions as "eating and drinking establishments" at the Lower, Moderate, and Higher Risk tiers. *Id.*

(N.D. Ill. 2020). Multiple epidemiological studies show that restaurants are likely to be a significant source of infection. ECF 24 at ¶ 19. This makes them unlike, for example, retailers where shoppers usually wear masks, keep moving, and contact is fleeting. It does not exceed the bounds of rational speculation for Defendant to believe that restaurants present different, higher risks than retail or grocery commercial establishments and accordingly limit capacity in restaurants to a higher degree than in those other stores.

Plaintiffs emphasize the increase in vaccination numbers in arguing that Defendant's risk level limitations are now irrational, but it appears that Defendant's risk level framework has incorporated vaccination progress into its ongoing risk level analysis. On April 6, 2021, Governor Brown announced that a new metric would be added for determining "Extreme Risk" level. The Governor stated that beginning that week, "for counties to move to (or remain in) Extreme Risk, they must meet the county metrics for case rates and percent positivity, plus a new statewide metric: COVID-19 positive patients occupying 300 hospital beds or more, and a 15% increase in the seven-day average over the past week."[9] She noted that "[a]s vaccine distribution increases, case counts and percent positivity will not be adequate indicators on their own for measuring the threat COVID-19 poses to public health."[10]

On May 11, 2021, the Governor provided vaccination targets for individual counties to move to the Lowest Risk category, and a statewide target for the risk level metrics to be eliminated entirely. ECF 22 at 5–7. She stated that beginning on May 21, counties will have the

---

[9] *Governor Kate Brown Announces Updates to County Risk Levels*, State of Oregon Newsroom (April 6, 2021), available at https://www.oregon.gov/newsroom/Pages/NewsDetail.aspx?newsid=54467, last accessed May 20, 2021); *See also* ECF 21 at 9–10 & n.16.

[10] *Id.*

PAGE 13 – OPINION AND ORDER

option to move weekly to the "Lower Risk" level by reaching 65% vaccination rate for the county population 16 or older with a first dose of vaccine and submitting to OHA a plan for closing equity gaps in vaccination efforts. *Id*. at 6. She also set a 70% statewide goal for receiving at least one dose of the vaccine to "lift most Risk Level restrictions." *Id*. at 5.

On May 13, the same day that the CDC announced that fully vaccinated people no longer need to wear masks or maintain physical distance, the Governor announced that Oregon would follow suit.[11] On May 18, the state provided that updated guidance.[12] However, OHA's risk level metrics remain in place, including limitations on indoor seating capacity at restaurants, with capacity limitations adjusting based a county's risk level. At the hearing, counsel for Defendant argued that most restaurants have said that they are not interested in policing vaccination status of their patrons. Such a factual assumption is within the bounds of rational speculation. *See Golinski*, 824 F. Supp. 2d at 996. This Court finds that Defendant's chosen course of action, which incorporates vaccination progress into evaluating risk while not explicitly distinguishing between vaccinated and unvaccinated individuals, is rationally related to the legitimate government purpose.

---

[11] *Oregon updates masking and physical distancing guidance for fully vaccinated*, Oregon Vaccine News (May 13, 2021), available at https://covidblog.oregon.gov/oregon-updates-masking-and-physical-distancing-guidance-for-fully-vaccinated/, last accessed May 20, 2021; *see also* ECF 21 at 11 & n.21.

[12] *Oregon officially establishes new masking and physical distancing guidance,* Oregon Vaccine News (May 18, 2021), available at https://covidblog.oregon.gov/oregon-officially-establishes-new-masking-and-physical-distancing-guidance/, last accessed May 20, 2021.

### b. Substantive Due Process[13]

Plaintiffs argue that their constitutionally protected interests have been infringed without due process of law. ECF 18 at 6–7; ECF 27 at 3–4. Plaintiffs alternatively discuss property interests in the licenses themselves and a liberty interest in the "right to operate—to transact business with, associate with, and serve vaccinated individuals without restriction." ECF 18 at 6. Plaintiffs concede that all their claims are subject to rational basis review. *See, e.g.,* ECF 1 at ¶¶ 29, 39; ECF 7 at 10–12.[14]

In applying rational basis review, the court does "not require that the government's action actually advance its stated purposes, but merely look to see whether the government *could* have had a legitimate reason for acting as it did." *Sagana v. Tenorio*, 384 F.3d 731, 743 (9th Cir. 2004) (quoting *Wedges/Ledges of Cal., Inc. v. City of Phoenix*, 24 F.3d 56, 66 (9th Cir. 1994)) (emphasis in original); *see also 910 E Main LLC v. Edwards*, 481 F. Supp. 3d 607, 620 (W.D. La. 2020) (concluding that the "Governor's executive orders restricting the operation of bars,"

---

[13] Plaintiffs' supplemental briefing appears to assert due process and equal protection claims on behalf of all vaccinated Oregonians as well. *See* ECF 18 at 2–6 (alleging EO 21-10 infringes upon the "liberty interests of individuals with vaccinations" by precluding them from "patronizing and associating with others in public eating and drinking establishments"), 7–8 (arguing equal protection "violation of liberty interests of individuals with vaccinations"). Plaintiffs' reply brief further asserts liberty interests of all people in Oregon, vaccinated and unvaccinated. ECF 27 at 3 ("the EOs infringe on the liberties of both vaccinated and unvaccinated persons, who may safely associate together in groups"). The Court finds no basis to support Plaintiffs' standing to bring such broad claims. Plaintiffs' Complaint as it relates to restaurants focuses on harm to restaurant operators. *See, e.g.,* ECF 1 at ¶¶ 34, 39, 40. Plaintiffs—a restaurants owner, a restaurant and a political action committee representing restaurants—allege *economic* harm from restaurant restrictions, rather than any general harm suffered from themselves being unable to patronize restaurants or associate with people. *See* ECF 11 at ¶ 4–5; ECF 9 at ¶¶ 4–6. Further, none of the Plaintiffs profess to be vaccinated themselves.

[14] In support of all alleged liberty interests, Plaintiffs cite only *Chalmers v. City of Los Angeles*, 762 F.2d 753 (9th Cir. 1985), which concerned the due process property interest in engaging in an occupation. *See* ECF 18 at 2–3.

which affected license value, "must be judged under a deferential 'rational basis' review applicable to economic regulation.").

Here, Plaintiffs argue that the only rational approach is to allow some "small" number of unvaccinated people to eat indoors with a larger number of vaccinated people based on the CDC's latest guidance. Plaintiffs argue that the capacity limitations, which adjust based on county risk levels, are irrational in limiting that activity.

This Court finds that EO 21-10 is rationally related to the legitimate state interest. The capacity limitations are tied to risk levels in each county, which are calculated based on criteria such as case rates and hospital capacity. Plaintiffs agree that under current CDC guidance, groups of unvaccinated, unmasked people indoors still pose a risk. As explained above, Defendant appears to take a rational approach by incorporating the promise and progress of vaccinations as well as COVID-19's risk to safety into capacity limitations.

Because Plaintiffs have not established a likelihood of success on the merits as it relates to their EO 21-10 challenge, the TRO against EO 21-10 must be denied. *See DISH Network Corp.*, 636 F.3d at 782 (declining to consider the remaining three elements of the *Winter* test after concluding that the plaintiff failed to demonstrate it was likely to succeed on the merits of its claim).

## CONCLUSION

For the reasons stated above, Plaintiffs' Motion for Temporary Restraining Order, ECF 7, is DENIED.

**IT IS SO ORDERED**.

DATED this 20th day of May 2021.

/s/ Karin J. Immergut
Karin J. Immergut
United States District Judge